**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN B. OWENSBY,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. 1:15-cv-00334-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS |

Plaintiff Steven B. Owensby seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act"). The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Magistrate Judge. Following a review of the record and applicable law, the Court affirms the decision of the Administrative Law Judge ("ALJ").

I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

A. *Procedural History*

Plaintiff applied for DIB on January 28, 2008, alleging disability beginning on April 6, 2007.

---

[1] The relevant facts herein are taken from the Administrative Record ("AR").

1

AR 108, 294.  The Commissioner denied Plaintiff's claims on April 28, 2008, and upon reconsideration on August 7, 2008.  AR 108, 116.  Plaintiff then timely requested a hearing before an ALJ.  AR 159.

At a hearing on October 7, 2010, before ALJ James P. Berry, Plaintiff appeared with counsel.  Also present was an impartial vocational expert ("VE").  AR 82.  Thereafter, on November 2, 2010, ALJ Berry issued a written decision finding Plaintiff not disabled under the Act.  AR 137.  The Appeals Council remanded the case on the ground that the decision did "not contain an adequate evaluation of [Plaintiff's] mental impairments."  AR 143.  On remand, the ALJ was to obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's mental impairments, obtain supplemental evidence from a VE if necessary, and determine if drug addiction and/or alcohol are contributing factors material to the finding of disability.  AR 143-144.

At the second hearing, held on March 5, 2013, Plaintiff appeared and testified before ALJ Sharon L. Madsen.  Also at the hearing were Plaintiff's counsel, a medical expert, and a VE.  AR 48.  In a written decision dated March 26, 2013, ALJ Madsen found Plaintiff not disabled under the Act.  AR 40.  On January 2, 2015, the Appeals Council denied review of ALJ Madsen's decision, which thus became the Commissioner's final decision, and from which Plaintiff filed a timely complaint.  AR 4, Doc. 1.

B.  *Factual Background*

The Court will not recount in detail all the facts of this case, discussing only what is relevant to this appeal.

1.  Medical Evidence

As one physician observed, Plaintiff has a convoluted medical history which is amply demonstrated by his lengthy record.  In November 2006, Plaintiff reported to Valerie A. Schuman, D.O., at Concentra Occupational Medical Centers about a work injury he suffered to his left shoulder

in September. AR 368. A month later, Plaintiff saw an orthopedist, Ronald Castonguay, M.D., for treatment of his shoulder injury. Dr. Castonguay opined clear-cut impingement syndrome and placed Plaintiff on modified duties after injecting his shoulder with Depo-Medrol and Marcaine. AR 366.

In March 2007, Dr. Schuman assessed Plaintiff with left shoulder impingement, shoulder pain, shoulder strain of the trapezius or rhomboid, cervical neuropathy, herniated disc, nicotine addiction, spinal stenosis cervical region, degenerative disc disease, and left anterior glenoid labrum tear. She believed most of Plaintiff's symptoms stemmed from his shoulder abnormalities and that surgical repair of the left shoulder would serve him well. He was placed on modified activity, with no lifting, pushing or pulling over twenty pounds. AR 357.

In May 2007, Dr. Castonguay operated on Plaintiff, performing a left shoulder arthroscopy, decompression, and superior labral anterior to posterior /labral repair. AR 444. He referred Plaintiff to Troxell and Mohr Physical Therapy ("TMPT") for post-surgery care. But after only one visit, Plaintiff was granted discharge from TMPT as he requested transfer to another physical therapy office. Wayne Troxell, M.P.T., O.C.S., noted in the discharge report that the next physical therapy office would be Plaintiff's third or fourth one, post-surgery. AR 432-433.

Dr. Castonguay continued to monitor Plaintiff's condition from July 2007 to October 2008. From July to November 2007, Dr. Castonguay submitted monthly letters reporting Plaintiff's condition to the State Compensation Insurance Fund ("SCIF") for purposes of Plaintiff's workers' compensation case. AR 404-413. In the October 2007 letter, Dr. Castonguay stated examination of the rotator cuff was "very difficult to assess because the patient just does not give maximal effort." AR 406. That same month, Mark A. Mandel, M.D., F.A.C.S., completed a comprehensive medical-legal evaluation of Plaintiff and diagnosed him with: left shoulder labral tear, significant myofascial neck pain, and pre-existing narcotic and nicotine addiction. Dr. Mandel opined "[t]here may be an

3

element of symptom magnification in the patient's articulation of his complaints, but he was using good effort in doing the strength determinations." He noted Plaintiff "was on Norco and Oxycontin before the injury to the shoulder girdle/neck area" and should "be detoxified." AR 539-540. Dr. Mandel opined Plaintiff's work restrictions to be: no repetitive flexion or extension, twisting, torqueing or rotatory motions of the neck, no very heaving lifting and carrying, no repetitive pushing and pulling, no repetitive grasping with the left arm, and no repetitive work at or above the shoulder level . AR 543-544.

In January 2008, Dr. Castonguay expressed concern with some issues in Plaintiff's left shoulder recovery, namely difficulty with pain management, compliance, and his remaining cervical spine issue. Consequently, Plaintiff was scheduled to undergo a second surgery to repair the left shoulder. AR 398. In May 2008, about two months after the second surgery, Plaintiff complained that his shoulder had not improved. Dr. Castonguay explained that improvements would take longer after a repeat procedure, and recommended a psychiatric and psychological evaluation. AR 466. In June 2008, Plaintiff continued to complain of pain and popping of the left shoulder even though Dr. Castonguay found excellent range of motion and no instability. He noted that "any subjective complaints that this patient has of pain in his shoulder are by far outweighing any physical findings" and that he "appears to be very unhappy with the management but more related currently to his factors of disability in state disability that are being denied." Dr. Castonguay further stated that no refills of medication would be given to Plaintiff, who had expressed wanting a different physician to manage his shoulder problem. AR 464. In October 2008, Plaintiff was evaluated for the last time by Dr. Castonguay, who again noted that the subjective complaints outweighed the objective findings, that Plaintiff was "belligerent," and refused further treatment. Dr. Castonguay noted that "[a]s far as the entire work comp case goes," Plaintiff had reached a maximum level of medical improvement and it was unlikely he would ever resume doing the type of work he did before the onset of his

workers' compensation claim. He was discharged from Dr. Castonguay's care. AR 475.

Keith M. Quint, M.D., a state medical consultant, completed a physical residual functional capacity ("RFC") assessment of Plaintiff in April 2008. Dr. Quint opined Plaintiff could: (1) lift and carry twenty pounds occasionally and ten pounds frequently; (2) sit, stand and/or walk for a total of about six hours in an eight-hour workday; (3) occasionally push and pull, climb ladders, ropes and scaffolds, and lift overhead with the left upper extremity; and (4) frequently climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and grip or grasp with left upper extremity. Plaintiff had no limits with the right upper extremity and no visual, communicative or environmental limitations. Dr. Quint noted Plaintiff had a medically determinable impairment but the symptoms are greater than the objective findings. AR 454-458.

In December 2008, Robert G. Salazar, M.D., a pain management specialist referred by Dr. Castonguay, evaluated Plaintiff and diagnosed him with insomnia, cervical disk degeneration, and unspecified shoulder disorder. Dr. Salazar referred Plaintiff to Malcom Ghazal, M.D., for a second opinion regarding treatment of the left shoulder. AR 478. In a January 2009 letter to SCIF, Dr. Ghazal stated that "[e]valuation of the shoulder was difficult because of guarding with active and passive movements" and that he could not evaluate the "shoulder with the physical exam . . . because of significant guarding." AR 481-482.

From April 2009 to July 2011, Kathleen A. Baron, M.D. was Plaintiff's primary treating physician. Dr. Baron completed nearly monthly workers' compensation reports outlining Plaintiff's progress. For over two years, she documented Plaintiff's conditions, noting lapses and improvements related thereto, and prescribed him medications including Norco, Zanaflex, Lyrica, Zipsor, Trazadone, Celebrex, and Prozac. In January 2010, Dr. Baron diagnosed Plaintiff with narcotics abuse and withdrawal, depression, symptoms of radiculopathy, and saw no improvement in his neck, shoulder or back pain. By September 2010, he was no longer on narcotics, appeared

hopeful, and had joined a church. In November 2010, Plaintiff reported being happier due to his involvement with church activities. And in July 2011, though he still had chronic pain which required medications, Plaintiff appeared to be stable on Prozac, Zipsor, Trazodone, and Lyrica. AR 483-502; 736-843.

Three x-rays taken in April 2010 showed the condition of Plaintiff's left shoulder, lumbar spine and cervical spine. The x-ray of Plaintiff's left shoulder revealed possible impingement of chronic rotator cuff injury, but otherwise a normal left shoulder. The x-ray of Plaintiff's lumbar spine revealed minimal dextroscoliosis and degenerative disc space narrowing at L3-4 and L4-5. And the x-ray of his cervical spine revealed degenerative changes with disc space narrowing at C6-7 and mild anterior osteophyte formation at C5-6 and C6-7; questionable left carotid artery calcification; and no interval change since October 2007. AR 660-662. Also in April 2010, Dr. Mandel completed a second comprehensive medical-legal evaluation of Plaintiff. Therein, Dr. Mandel noted:

> I did notice Mr. Owensby leaving my office . . . and the severe abnormal positioning of his shoulder girdle/neck and the antalgic gait were not noted. He appeared to be walking without an antalgic gait, and it appeared that the loss of motion in his neck and possibly his shoulder was at least in part volitional.

AR 633. Also:

> [he] appears to be guilty of some symptom magnification, and the degree of holding his arm in an abnormal position may well be in part volitional, since I did observe Mr. Owensby exiting the men's room and walking down the corridor, at that time, his shoulder appeared to be far more relaxed, and I did observe him walking and found no indication of an antalgic gait.

AR 635-636. With regard to work restrictions:

> He is going to need the same restriction for the neck, namely no repetitive flexion/extension, twisting, torqueing or rotatory motions. I would also recommend no very heavy lifting and carrying due to the neck.

> In terms of the patient's shoulder, he . . . appears to be incapable of working above shoulder level at all with his minor arm, but . . . he has normal strength distal to the shoulder, namely in the elbow, wrist and digits, but is going to have to avoid . . . heavy lifting and carrying and repetitive pushing and pulling, which is going to be a 50% loss of his pre-injury capacity.  There is no need for any gripping, twisting, torqueing, flexion/extension or dexterity restrictions, since function at the hand/wrist level is completely normal.  The restrictions are unilateral for the left side only.

AR 639.  The restrictions are similar but more detailed than those from the prior evaluation.  Dr. Mandel did not think Plaintiff was a candidate for any type of fusion or discectomy.  He recommended detoxification and advised against any invasive care.  AR 640-641.

William L. Siegfried, M.D., was Plaintiff's psychiatrist for nearly five years, from July 2008 to January 2013.  Plaintiff was self-referred.  He reported undergoing detoxification in 2007 as a result of an addiction to medications.  After the initial meeting, Dr. Siegfried found Plaintiff "not clearly out of substance abuse, but appears to be motivated to work for keeping himself out of another addiction cycle."  AR 526.  During certain visits, Plaintiff expressed anger and frustration concerning the lack of progress with his workers' compensation claim in providing assistance with his shoulder issue. Dr. Siegfried noted that in July 2009, Plaintiff was using more than the allotted amount of Norco and in January 2010 confronted him about the misuse which was interfering with his treatment.  Plaintiff reported using excessive pain medications in February 2010 and admitted to obtaining medication from another source when he ran out.  In August 2010, Plaintiff was more energetic and had a better outlook with his thinking but in August 2010 "continue[d] to adjust meds himself."  Dr. Siegfried concluded in November 2010 that Plaintiff "cannot be trusted with addictive meds."  AR 504-526, 689-697.  Also in 2010, Plaintiff completed a sixteen-week pain management program with Gareth C. Houghton, Ph.D.  The program assisted him with formulating pain coping skills and dealing with emotional issues associated with his pain and workers' compensation case.  AR 734-735.

In 2011, Dr. Siegfried noted Plaintiff had a shift in inactivity and attitude. There were fewer complaints about his workers' compensation case. He seemed more stable at times and continued his involvement with church which included volunteering at the church garden and distributing produce. Though he still experienced episodes of depression, Plaintiff purchased a house in 2012 and made a project out of cleaning it up, which gave him "purpose." He reported receiving a 4.0 grade point average in school for the Fall 2011 semester. AR 676-686. In June 2012, Plaintiff reported increasing his Norco consumption and by September 2012 was taking seven Norcos per day. But in the January 2013 medication monitoring note, Dr. Siegfried found no overt substance abuse. AR 853-855.

Dr. Siegfried referred Plaintiff to Garry M. Bredefeld, Ph.D., whom Plaintiff saw concurrently. The record contains monthly handwritten progress notes from Dr. Bredefeld from July 2008 to January 2013. The notes are, however, illegible. In a typed letter to Plaintiff's counsel in July 2009, Dr. Bredefeld noted Plaintiff had been abusing his pain medications and needed drug rehabilitation therapy. AR 586. A year later, he concluded that Plaintiff continued to manifest significant depression. AR 724.

Soad Khalifa, M.D., of MDSI Physician Services completed a comprehensive psychiatric evaluation of Plaintiff in September 2012. Dr. Khalifa diagnosed Plaintiff with: alcohol abuse in remission; amphetamine abuse in remission, opioid dependence in partial remission; dysthymic disorder; and, shoulder and back pain. Functionally, Plaintiff "should not be managing his money due to history of drug abuse and he is still taking seven Norcos a day." He "should be able to perform simple tasks," but "would have difficulty performing detailed tasks because of his depressive symptoms, anxiety, nervousness, anxiety attacks, and low self-esteem." Additionally, Plaintiff would have difficulty accepting instructions from supervisors, interacting with co-workers, performing work activities on a consistent basis, maintaining regular attendance, or dealing with

workplace stress. AR 852.

Dr. Khalifa also completed a medical source statement, a check-the-box and fill-in-the-blank form, of Plaintiff's mental ability to do work-related activities. Dr. Khalifa indicated that due to mild difficulty concentrating, Plaintiff had slight limitations in understanding, remembering and carrying out short simple instructions. He also had slight limitations with making judgments on simple work-related decisions. Further, because of his anxiety attacks and nervousness, Plaintiff had marked limitations in responding to changes in a routine work setting, moderate limitations in interacting appropriately with supervisors and co-workers, and slight limitations in interacting appropriately with the public. Dr. Khalifa opined Plaintiff "could be affected by side effects and residual effects of drug abuse." AR846- 847.

2. <u>Plaintiff's Written Testimony</u>

In his first disability report, undated, Plaintiff stated low back pain, left shoulder and neck injuries limited his ability to work. He could not lift or do any mechanical work. He stopped working on April 6, 2007, when his physician placed him on disability. He had been working as a mechanic since 1998 and was an assistant manager at a car wash from 1995[2] to 1996. As a mechanic, Plaintiff changed brakes, struts and suspension parts. On a daily basis, he spent: ten hours walking, standing, handling/grabbing/grasping, and reaching; one hour sitting; eight hours climbing; nine hours stooping, kneeling and crouching; and, eight hours writing/typing/handling small objects. He lifted fifty pounds or more frequently and 100 pounds or more at most. AR 314-316. In his second disability report, undated, Plaintiff reported worsening pain in his shoulder and neck beginning in February 2008. He continued to see Drs. Castonguay and was taking Vicodin for his pain. AR 329-332. In his third disability report, undated, Plaintiff reported two new illnesses which began in July 2008: depression and anxiety. He took Norco and Zanaflex for pain and Remeron for

---

[2] Plaintiff's work history report, undated, states he worked at the car wash from 1994 to 1996. AR 324.

9

depression. AR 339-341. In January 2010, Plaintiff's medications included Trazodone to help with sleep, Prozac to treat depression and anxiety, Celebrex to treat arthritis and pain, and Norco and Morphine to treat pain. AR 347.

### 3. Plaintiff's Oral Testimony

At the hearing before ALJ Madsen, Plaintiff testified he cooked, shopped and did yardwork when needed. He went to church on Wednesdays and Sundays, volunteering in the garden. He also volunteered as a leader with Awana for youth. A typical day included going to school, doing homework, involvement with the associated student government, and watching television or listening to music. AR 56-57.

Regarding his medical issues, Plaintiff discussed the continuing pain in his low back and left shoulder, for which he underwent surgery in 2005 and 2007. He was, at the time, taking Norco, used a heating pad and a TENS unit. He could lift about thirty pounds, sit for a couple of hours before needing to stand, stand for a few hours before needing to sit, but not generally climb stairs. School and life issues caused Plaintiff anxiety and depression, which affected him daily. He sometimes had thoughts of suicide. AR 59, 61-63, 76, 69.

He received tutoring at school because he struggled with comprehension and studying. Plaintiff considered himself a shy guy and does not get along easily with people. He admitted to having a substance abuse issue in the past, but had been sober for a couple of years. Plaintiff confirmed that his worker's compensation case had settled for a lump sum, but no future medical care. Plaintiff continued to receive psychiatric treatment from Drs. Siegfried and Bredefeld. AR 64-66.

### 4. Medical Expert Oral Testimony

Paul Wiese, the medical expert, gave his opinion of Plaintiff's condition at the hearing. Dr. Wiese opined that Plaintiff's depression met the level of a major depressive disorder which falls

under 12.04, and that his anxiety falls under 12.06. AR 70.  He further opined that the drug addiction and/or alcoholism ("DA&A") are material, and that even without them Plaintiff's ongoing symptoms would still meet listings 12.04 and 12.06.  AR 73.  When questioned by Plaintiff's counsel about when the DA&A were not material, Dr. Wiese opined that time to be approximately July 2010.  AR 74.

5. Vocational Expert Oral Testimony

Stephen Schmidt, the VE, testified about Plaintiff's past work and occupational base.  He classified Plaintiff's past work as a car wash supervisor and an automobile mechanic.  The ALJ asked the VE to consider a person of Plaintiff's age, education, work background, and who could: lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk six to eight hours in an eight-hour day; occasionally engage in overhead lifting and reaching, pushing and pulling with the left upper extremity; frequently grip and grasp with the left upper extremity; occasionally climb ladders, ropes and scaffolds; and frequently stoop, crouch, crawl, climb, and kneel.  The VE opined that such person could engage in Plaintiff's past work as a car wash supervisor, and in the alternative, as an information clerk, parking attendant, or office helper.  Next, the ALJ asked the VE to consider a person with the same lifting, carrying, sitting, standing and/or walking limitation, but who: could not engage in any repetitive pushing or pulling with the left upper extremity, could not work at or above the shoulder level with the left upper extremity, and could not engage in repetitive flexion, extension, twisting, torqueing or rotary motions of the neck.  The VE opined that such person could not perform Plaintiff's past work or any other jobs.  Finally, the ALJ asked the VE to consider the same person in the first hypothetical, except that he could only occasionally stoop, crouch, crawl, climb, balance and kneel, and engage in simple routing tasks with occasional public contact.  According to the VE, such person could perform the job of office helper, but no other jobs.  AR 75-78.

11

Plaintiff's counsel also posed a question for the VE, asking him to consider the same person in the ALJ's third hypothetical, but adding to it that such person has moderate, occasionally marked, limitations in concentration, persistence and pace. The VE stated that such person could not perform any of Plaintiff's past work or other work. AR 78.

6. <u>ALJ's Decision</u>

A claimant is disabled under Titles II if he is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months. 20 C.F.R. § 404.1505(a). To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ must employ to evaluate an alleged disability.[3]

In her written decision, ALJ Madsen initially employed the five-step sequential process and found Plaintiff disabled. At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 6, 2007. At step two, Plaintiff had the following severe impairments: cervical degenerative disc disease, lumbar degenerative disc disease, left shoulder rotator cuff tendinopathy, labral defect status post repair times two, depression, anxiety, and a history of opiate abuse. At step three, Plaintiff's impairments or combination thereof did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. With regard to his RFC, Plaintiff could: lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk for six to eight hours in an eight-hour workday; occasionally stoop,

---

[3] "In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work. The claimant bears the burden of proof at steps one through four." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

crouch, crawl, climb and kneel; occasionally climb ladders, ropes and scaffolds; frequently grip and grasp with the left upper extremity; occasionally lift, reach, push and pull with the left upper extremity; and is limited to simple routine tasks with no work around supervisors, co-workers or the public.  At step four, Plaintiff could not perform any past relevant work.  And finding no jobs which exist in significant numbers in the national economy that Plaintiff could perform, the ALJ concluded Plaintiff was disabled under the Act.  AR 25-36.

In light of Plaintiff's substance use disorder, however, the ALJ made additional findings.  She found that if Plaintiff stopped his substance use: (1) the remaining limitations would have more than a minimal impact on his ability to perform basic work activities such that he would continue to have a severe impairment or combination thereof; (2) Plaintiff's impairment or combination thereof would not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) Plaintiff would have the same RFC except that he is limited to simple routine tasks with occasional public contact; (4) Plaintiff would not be able to perform past relevant work; and (5) there would be a significant number of jobs in the national economy which Plaintiff could perform, namely as office helper; and (6) the substance use disorder was a contributing factor material to the disability determination because Plaintiff would not be disabled if he stopped the substance use.  Consequently, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from the alleged onset date through the date of the decision.  AR 36-40.

## II.  DISCUSSION

A.  *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner. However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted). "If the evidence can support either outcome, the Commissioner's decision must be upheld." *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010). But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination." *Robbins v. Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006).

B. *Analysis*

On appeal, Plaintiff avers the ALJ erred in assessing the opinion of Drs. Mandel and Khalifa, and failed to secure an explanation from the VE concerning the conflict between the VE's testimony and the DOT. The Court addresses Plaintiff's averments in turn.

1. Dr. Mark A. Mandel

Plaintiff avers the ALJ did not properly assess Dr. Mandel's opinion. Specifically, he states the ALJ "failed to state *any* reason" for rejecting Dr. Mandel's opinion about Plaintiff's "neck limitations, shoulder limitations, and the pushing/pulling limitations." He references, for support, the VE's response to the ALJ's second hypothetical. Doc. 12, pg. 14. Plaintiff thus essentially argues that because the VE concluded a person with the limitations opined by Dr. Mandel could not perform any job, and the ALJ did not adopt the VE's conclusion, the ALJ necessarily rejected Dr.

Mandel's opined limitations and did so without proper reason. The Commissioner contends the ALJ properly weighed the medical opinions, including those of Dr. Mandel, and made substantially supported findings.

Plaintiff's position is fallacious and meritless. As an initial matter, Plaintiff does not dispute the ALJ's ultimate RFC findings, which are based on Dr. Quint's opined limitations. To the extent that the ALJ did not adopt all of Dr. Mandel's opined limitations, the ALJ did not do so without reason. She recognized Dr. Mandel's evaluations (and those of other physicians) were completed for purposes of Plaintiff's workers' compensation case and explained that the "Worker's Compensation system focuses on whether the injured worker is able to return to his usual and customary employment," whereas the "Social Security Regulations require an assessment of whether the individual is able to perform any work that exists in the national economy." AR 31. She also discussed Dr. Mandel's notes and Plaintiff's activities of daily living, which undermined his credibility concerning the alleged intensity, persistence and limiting effects of his symptoms. And Plaintiff does not explain why the ALJ must adopt Dr. Mandel's opined limitations of the neck, shoulder and ability to push pull instead of Dr. Quint's.

Furthermore, a VE "translates factual scenarios into realistic job market probabilities" while the ALJ "weighs the evidence for probity and credibility." *Sample v. Schweiker*, 694 F.2d 639, 643 (9th Cir. 1982). An ALJ may decline to adopt a VE's response to a hypothetical question based on limitations not found by the ALJ. *See Benson v. Shalala*, 54 F.3d 785 (9th Cir. 1995) ("The ALJ is free to accept or reject restrictions which are supported by substantial evidence in the record and courts must uphold the ALJ's determination even in cases in which the decision is susceptible to more than one rational interpretation.") (internal quotations and citation omitted) *and Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("The hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in

15

the record."); *see also Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990) ("the hypothetical posed to the vocational expert did not set forth only impairments which had been accepted as true by the ALJ. Therefore, his opinion was not binding on the ALJ.") (citations omitted). As Plaintiff acknowledged, the ALJ's second hypothetical question to the VE contained the limitations opined by Dr. Mandel. But because the ALJ's ultimate RFC findings do not encompass Dr. Mandel's opined limitations, for reasons which Plaintiff does not dispute, the ALJ was not required to adopt the VE's response.

    2. <u>Dr. Soad Khalifa</u>

Plaintiff contends the ALJ erroneously rejected the opinion of Dr. Khalifa. Alleging the ALJ "manufacture[d]" her reasons, Plaintiff characterizes them as "a jumble of conjecture." Doc. 12, pg. 15. The Commissioner counters the ALJ permissibly and reasonably gave little weight to Dr. Khalifa's opinion.

Indeed, the ALJ gave "little weight" to Dr. Khalifa's opinions, finding them internally inconsistent and contradicted by Plaintiff's reported activities of daily living. AR 34. She explained: (1) Dr. Khalifa limited Plaintiff to simple tasks yet indicated (in the medical source statement) that he only had slight[4] limitations dealing with detailed instructions, and (2) Dr. Khalifa found Plaintiff would have difficulty accepting instructions from supervisors and interacting with co-workers yet indicated (in the medical source statement) that he was only moderately limited in those areas. Finally, the ALJ explained that Plaintiff's ability to attend school and his involvement with church on a regular basis undermined the finding of marked limitations with changes in a routine work setting. Contrary to what Plaintiff would have the Court find, these explanations are in fact substantially supported by the record and are a proper basis on which the ALJ could discount Dr. Khalifa's opinion. *See Zettelmier v. Astrue*, 387 F. App'x 729, 731 (9th Cir. 2010) (concluding

---

[4] The medical source statement states: "<u>Slight</u>—There is some mild limitations in this area, but the individual can generally function well." AR 846.

inconsistencies between a physician's assessments and conclusions justified the ALJ giving more weight to the state agency medical opinions).[5]

Plaintiff's conclusory assertion that Dr. Khalifa's opinions "are substantiated by Dr. Wiese" is of no moment absent any explanation or analysis. Doc. 12, pg. 16. *See Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 872 (9th Cir. 2001) *aff'd sub nom. Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) ("We therefore cannot grant relief [on this] argument, because he has failed to develop the record and his argument sufficiently to render it capable of assessment by this court."). The ALJ rejected Dr. Wiese's opinion concerning the mental listings, and Plaintiff does not dispute her reasoning or conclusion.

### 3. Vocational Expert's Testimony and the DOT

Plaintiff's final contention concerns a perceived discrepancy between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). He asserts that the job of office helper under the DOT requires frequent reaching, which conflicts with the ALJ's RFC finding of occasional reaching. This conflict, according to Plaintiff, required resolution by the ALJ, and her failure to do so was error. The Commissioner avers that Plaintiff misreads the ALJ's RFC findings and therefore any error was harmless.

As the Commissioner explained:

> In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy. We use these publications at steps 4 and 5 of the sequential evaluation process. We may also use VEs . . . at these steps to resolve complex vocational issues.

SSR 00-4P. Importantly:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT.

---

[5] This unpublished decision is citable under Rule 32.1 of the Federal Rules of Appellate Procedure. *See also* 9th Cir. R. 36–3(b).

> Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4p (emphasis added).

Plaintiff is correct that the job of office helper[6] requires frequent reaching, which means "from 1/3 to 2/3 of the time." DICOT 239.567-010. But his assertion that a conflict exists is unfounded. The ALJ provided that Plaintiff could occasionally reach with the left upper extremity. This finding does not include, as the Commissioner correctly pointed out, the right upper extremity. Plaintiff's RFC does not preclude frequent reaching with the right upper extremity. It is therefore tenuous to conclude, as Plaintiff has, that a conflict exists. And where no conflict exists, the ALJ had no issue to resolve.

Plaintiff's contention that the "DOT makes no distinction between right or left hand manipulations in its guidelines" is unavailing. Doc. 14, pg. 5. That Plaintiff could occasionally reach with his left upper extremity and has no restrictions with the right upper extremity does not, as Plaintiff claims, "preclude[] the identified jobs" because the DOT "lists maximum requirements of

---

[6] DOT code 239.567-010, which corresponds to office helper, states in relevant part:

> Performs any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010]. May specialize in delivering mail, messages, documents, and packages between departments of establishment and be designated Messenger, Office (clerical). May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).

DICOT 239.567-010.

occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." Doc. 12, pg. 18; SSR 00-4p; *MARIA GUTIERREZ, Plaintiff - Appellant, v. CAROLYN COLVIN, Acting Comm'r of Soc. Sec., Defendant - Appellee.*, 2016 WL 4056067, at *1 (9th Cir. July 29, 2016) (No. 14-35231). Finally, Plaintiff's reliance on *Lamb v. Colvin*, 2014 WL 3894919, at *3 (E.D. Cal. Aug. 4, 2014) (No. 1:13-CV-00137 GSA) is equally unavailing. Unlike here, the claimant there had an RFC which precluded overhead reaching with either upper extremity. *See id.* ("*She cannot engage in overhead reaching with the bilateral upper extremities*[.]") (emphasis in original). *Lamb* is factually distinguishable from this case and provides no persuasive authority.

### III. CONCLUSION

Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff Steve B. Owensby.

IT IS SO ORDERED.

Dated: **September 27, 2016**          **/s/ Sandra M. Snyder**
                                                                    UNITED STATES MAGISTRATE JUDGE